UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
TODD SIMONS,

                Plaintiff,

   -Against-

ROMAN CATHOLIC DIOCESE OF BROOKLYN, and
OUR LADY'S CATHOLIC ACADEMY,

                Defendants.
---------------------------------------------------------------------X

Civil Action No:  21 Cv. 3916

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Todd Simons ("Plaintiff" or "Simons"), by his attorneys the Gender Equality Law Center, brings this Federal Court Complaint ("the Complaint") against Defendants, the Roman Catholic Diocese of Brooklyn ("the Brooklyn Diocese") and Our Lady's Catholic Academy ("OLCA") to remedy violations of Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, N.Y.C. Admin Code § 8-101 *et seq.* ("NYCHRL") for discrimination based on sex, sexual orientation, and marital status.

## NATURE OF THE CASE

1. This is a case of blatant and unabashed discrimination on the basis of Plaintiff's sexual orientation. The facts contained in the Complaint demonstrate that Plaintiff, a schoolteacher who was hired for a purely secular position teaching music, was terminated from his job with OLCA and the Brooklyn Diocese when he disclosed, after being prompted, that he is gay and was married to a man. At no time have Defendants denied that the sole reason for terminating his employment in the fall of 2018 was because he is gay.

2. Although OLCA and the Brooklyn Diocese are undisputedly religious organizations, Simons was hired to teach music at OLCA, a position which included no religious instruction or duties.

3. Neither the Supreme Court decision in *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), nor in *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission*, 565 U.S. 171 (2012), extends to the facts of this case.

4. The fact that Simons agreed to do Defendants a favor by temporarily filling in for a fourth-grade teacher who was out for several months on medical leave before taking up his permanent job duties as a secular music teacher does not and should not waive his right to the protections under Title VII of the 1964 Civil Rights Act and the New York City Human Rights Law.

5. At the time Simons was hired, Defendants were aware that Simons was not Catholic and had no background in teaching Catholic doctrine or in religious instruction. Simons accepted the job with the clear understanding that the fourth-grade substitute teaching position was limited in time and scope and that he would assume his duties as music teacher as soon as the fourth-grade teacher returned.

6. Because Simons had no background in Catholicism—he was neither raised nor practiced that religion and had not studied it—any coverage of the period designated for religious studies in the fourth-grade class was merely covered by rote or using outdated worksheets. Simons was unable to answer specific questions about Catholic doctrine.

7. At no time during the period in which Simons was substituting for the fourth-grade teacher out on medical leave was Simons' teaching ever observed.

8. At no time during this period did OLCA Principal Kevin Coyne ("Principal Coyne") or any other employee of Defendant express any concern that Simons was unable to teach religion or that he was not Catholic—a fact that Principal Coyne established at the interview with Simons.

9. The fall of 2018 was a happy time for Simons. He enjoyed teaching the children and received positive feedback from Principal Coyne and others. Simons looked forward to a long-term relationship with Defendants.

10. Simons' teaching and his job all came to an abrupt halt in or around October 2018, after Simons entered the name of his husband into the Brooklyn Diocese's online portal when seeking information about the cost and coverage of medical insurance provided through the Brooklyn Diocese.

11. About a week later, Simons was summoned to the Rectory and told by Principal Coyne and Father Richard Conlon ("Father Conlon"), a parish priest affiliated with OLCA, that he was being fired solely because he is gay.

12. Although it has been nearly three years since that day, Simons still remains emotionally devastated by the termination and the humiliation he felt standing before Principal Coyne and Father Conlon and being told that he could not continue to work at OLCA solely because of his sexual orientation and whom he loved. These deep emotional wounds have impacted his ability to find comparable work and to sustain his marriage.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over Plaintiff's claims under Title VII pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiff's NYCHRL claims pursuant to 28 U.S.C. § 1367.

14. By notice dated April 13, 2021, the EEOC issued a Notice of Right to Sue for both Defendants, which was received on April 14, 2021. Copies of those notices are attached to this Complaint as Exhibit 1.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

16. Simons is a 45-year-old African American man who identifies as male and gay. He resides at 89-45 Doran Avenue, Apt. B, Glendale, New York 11385.

17. Simons was employed by OLCA and the Brooklyn Diocese from approximately September 1, 2018 to mid-October of 2018.

18. OLCA is a Catholic elementary school. At the time of the events in question, OLCA was located at 109-55 128th Street, South Ozone Park, NY. The school is a part of, and administered through, the Brooklyn Diocese.

19. The Brooklyn Diocese is part of the Roman Catholic Archdiocese of New York. The headquarters of the Brooklyn Diocese are located at 310 Prospect Park West, Brooklyn, New York 11215. The Brooklyn Diocese's territory encompasses Brooklyn and Queens.

20. The Brooklyn Diocese and OLCA are employers within the meaning of Title VII and the NYCHRL.

## STATEMENT OF FACTS

### Plaintiff's Interview for the Music Teacher Position

21. In the summer of 2018, Simons saw a posting for a music teacher position at OLCA and submitted an application online. The online application asked if he was a practicing Catholic and he answered "no."

22. Simons was invited by OLCA to interview for the for the music teacher position. In doing so, he met in person with Principal Coyne and Assistant Principal Debra Eisenbraun ("Eisenbraun").

23. Simons holds a Bachelor of Music degree from the University of South Carolina, a Master of Arts degree in Information Technology Management from Webster University, and a Master of Business Administration degree from Webster University.

24. During the interview, Simons and Principal Coyne discussed Simons' background teaching music in public schools. This included more than a decade of experience teaching music and/or orchestra to middle and high school students in South Carolina, Georgia, and New York.

25. Simons also discussed with Principal Coyne and Eisenbraun the details of the music teacher role at OLCA. This included the proposed job duties of the music teacher position, which focused exclusively on teaching instrumental music and music theory to the children who attended OLCA.

26. At no time during this initial meeting did Principal Coyne or Eisenbraun ever discuss with Simons that his role as a music teacher would include any religious duties, including instructing the children on religious music or preparing music for any religious service or Mass.

27. After discussing the music teacher position, Principal Coyne asked Simons if he would be willing to fill in on a temporary basis for a fourth-grade teacher who would be out for several months on a medical leave of absence. Simons understood that this was only a temporary substitute position and that the permanent music teacher position would begin as soon as the fourth-grade teacher returned from leave.

28. At the time of the interview, Simons had no experience teaching any of the fourth-grade subjects covered by fourth-grade teachers at OLCA.

29. At the interview, Principal Coyne asked Simons if he was a practicing Catholic. Simons told Coyne that he was not and told him that he had been raised as a Southern Baptist.

30. Principal Coyne also did not ask Simons about his knowledge of Catholic doctrine, nor whether he believed in any tenets of the Catholic faith.

31. Neither Principal Coyne nor Eisenbraun ever discussed that as part of covering for the fourth-grade class on a temporary basis Simons would need to cover any religious instruction.

32. At no time during this meeting did Principal Coyne or Eisenbraun ask Simons to explain any of the doctrinal differences between Catholicism and Southern Baptism, of which there are many.

33. At no time during this meeting did either Principal Coyne or Eisenbraun seem concerned that Simons was not Catholic.

34. Neither Principal Coyne nor Eisenbraun asked Simon any questions about Simons' religious beliefs, upbringing or knowledge about Catholicism.

35. At no time during this meeting did either Principal Coyne or Eisenbraun express any concerns about the fact that Simons had no religious training regarding Catholicism.

36. During this meeting, Principal Coyne made clear to Simons that he was doing OLCA a favor by covering for the temporary absence of one of the fourth-grade teachers who was taking a medical leave.

37. Simons agreed to fill in for the fourth-grade teacher on a temporary basis with the understanding that he was being hired on a permanent basis as the music teacher for the school.

38. Although Simons was wearing his wedding band during the interview, neither Principal Coyne nor Eisenbraun asked about his spouse.

39. After the interview, Simons signed an employment contract. As a result of signing the contract with the intent of accepting a full-time, permanent position with Defendants, Simons turned down a teaching position he had been offered with another organization.

40. Although the contract included some language about the Catholic faith and being a role model, Simons understood his role was to model good and responsible adult behavior to the children—not as any kind of religious authority—especially because he had already informed OLCA that he was not Catholic.

**Simons' Role as Substitute Fourth-Grade Teacher**

41. After being hired by OLCA, Simons attended a two-day teacher orientation before the 2018 – 2019 academic school year began.

42. During this orientation, Simons received a Faculty Handbook with a list of classes taught at OLCA. This was the only employee handbook Simons recalls receiving.

43. Upon receiving this handbook, Simons learned for the first time that, in addition to teaching math, science, social studies, English and language arts, he would be also be assigned to cover a period of religion. In addition to having no background in teaching

7

religious studies, or qualifications to do so, Simons also had no background in teaching math, science, social studies, English or language arts.

44. At no time did Defendants express any concern about Simons' lack of qualifications to teach the fourth-grade class any of the assigned subject matter. Simons understood this lack of concern to be attributable to the fact that he was merely covering until the permanent teacher returned from her medical leave.

45. At no point during the teacher orientation was Simons provided with any instruction, curriculum or written materials with respect to how to teach any type of religious instruction or on how to incorporate religion into other subjects.

46. At no point during the teacher orientation was Simons told he would need to model Catholic values or how he should or could model such values.

47. The two-day orientation was the only training Simons received about how to perform the job of covering on a temporary basis for the fourth-grade teacher who was out on medical leave. As a music teacher—the job for which he originally applied and was hired—Simons' job duties would have included teaching only music, with no academic or religious subjects.

48. Simons was instructed to teach all subjects from workbooks provided by OLCA. He also used lesson plans created by another fourth-grade teacher.

49. When students asked questions about the contents of the religion materials, Simons would discuss broad values like kindness and fairness, refer them to the textbook or ask students to discuss their own thoughts. Because Simons is not Catholic and had never received instruction in the Catholic faith, he was not able to answer specific questions about Catholic religious doctrine.

50. The other subjects Simons taught were purely secular. Because Simons was not knowledgeable about Catholicism and never received any other training from OLCA, he never incorporated religion into the other subjects he taught.

51. At no time during the six weeks that Simons was acting as a substitute teacher for the fourth-grade class did any employee of Defendants observe his teaching in the classroom, express concern over his inability to teach Catholic doctrine, or question his focus on general values such as kindness and fairness.

52. Defendants held a Mass about once a month and Simons escorted his students to one or two of these Masses while he worked for OLCA. Simons' role was to ensure that the students behaved and were respectful, as he would at any other secular assembly.

53. During this period of time, the feedback from Principal Coyne was gratitude that Simons was covering for the teacher who was out on medical leave.

54. At all times during Simons' short employment with Defendants, both Plaintiff and Defendants understood that Simons was doing Defendants a favor by starting the year out as a substitute teacher, rather than beginning his job as the school's music teacher; the position for which he had applied, was interviewed and hired for on a permanent basis.

### Simons' Job Performance at OLCA

55. Simons had every reason to look forward to a long and successful career at OLCA. In his first weeks on the job, Simons received positive feedback from students, parents, and from Principal Coyne.

56. Defendants never formally evaluated Simons' job performance at OLCA in his temporary capacity. Defendants never instructed Simons to incorporate religious teaching into his lessons.

57. Simons never discussed his sexual orientation or marriage to a man with his students or other OLCA staff because he did not think it was necessary or appropriate to discuss his private life at work. He never discussed publicly nor took a position on the Catholic Church's prohibition on same sex marriage.

### Simons' Application for Health Insurance Benefits

58. In or around October 2018, Simons began the process of exploring whether or not to apply for employee health insurance coverage. At the time Simons sought employee health insurance benefits, the health insurance benefits were provided by Defendant the Brooklyn Diocese.

59. In order to access the application for employee health insurance, Simons was required to log onto a website called "Paycom" and enter into the portal his personal information. When prompted to enter his spouse's name, Simons entered his husband's first name, "Marco."

60. Simons did not complete the application or submit the online form; instead, he just entered them in the online system. Because the premiums were very expensive, Simons wanted to wait and discuss the expense with his husband before taking further steps to obtain health insurance coverage.

### Termination of Employment at OLCA

61. On or around October 18, 2018, about a week after providing the first name of his husband in the Paycom portal, Simons was summoned to the Rectory.

62. In the Rectory, Simons was met by Principal Coyne, parish priest Father Richard Conlon, and a third person whose name Simons does not recall.

63. Principal Coyne informed Simons that Defendants had learned from the information entered into the Paycom portal that Simons' partner had a male name. Principal Coyne asked Simons if he was married to a man, and Simons responded that he was married to a male partner. Father Conlon then asked if Simons was "legally married on paper" and Simons said yes.

64. Following this discussion, Principal Coyne asked Simons to return to the fourth-grade classroom where he was temporarily covering for the teacher out on leave.

65. Approximately 30 minutes later, Principal Coyne's secretary came to Simons' classroom and asked him to return to the meeting.

66. When Simons arrived back to the Rectory, Principal Coyne told Simons that Defendants were firing him because he was married to a man.

67. Simons told Principal Coyne and Father Conlon in the meeting that he had planned to opt out of spousal coverage. Principal Coyne responded, "I so wish you had [opted out]," implying that had Simons not entered the information about his spouse into the online portal, they would not know that Simons was gay or married to a man, and he therefore could remain employed with OLCA.

68. Principal Coyne expressed regret that the school had found out Simons was married to a man because he admired Simons' teaching skills. Specifically, he told Simons that he was a "wonderful" part of the staff and "great with the kids" and "a good role model to them."

11

69. Principal Coyne instructed Simons to make up an excuse to explain to his students why he was leaving and to refrain from telling his students the truth. Principal Coyne told Simons he that could finish out the work week in his classroom teaching his students.

70. Simons was devastated when he heard that he was being fired because he was gay and married to a man. He felt disrespected and discarded. He felt humiliated having to stand before Principal Coyne and Father Conlon and hear he was being fired for being gay and married to a man.

71. Following this conversation, Simons was too ashamed and embarrassed to face his students and colleagues. He was so upset by the thought of having to lie to them—that is, to have to make up a reason why he was being fired—that he could not even bring himself to return to his classroom to say goodbye and instead immediately left the school premises. Simons did not even feel comfortable retrieving his personal property from his classroom because he was embarrassed and ashamed about being fired for being gay.

**Effects of Defendants' Discrimination on Plaintiff**

72. As a result of the sexual orientation and marital status discrimination that Simons experienced at the hands of Defendants, Simons and his partner experienced serious financial difficulties. In addition, Simons' feelings of low self-worth and humiliation related to the fact that Defendants had told him he could not continue teaching in their school solely because of his sexual orientation and because of whom he loved caused negative ramifications in his marriage to Marco. Moreover, the discriminatory and humiliating treatment Simons experienced by being fired solely because he is gay was exacerbated by the fact that for most of his adult life Simons had been relatively private about being gay and had now been publicly outed and fired solely because of his identity.

73. Following his termination, Simons has suffered from depression, low self-worth, and low self-esteem. Simons needed and wanted to seek therapy to help with his feelings of sadness and low self-worth, but he was unable to obtain therapy because he did not have health insurance to cover the cost and was not otherwise able to pay for a therapist.

74. The loss of income received from his teaching position caused stress on Simons and his partner who needed the income to support themselves.

75. In addition to the actual financial pressures experienced by Simons and his husband because of the loss of his income, Simons felt extraordinary guilty for losing his teaching job and thus his ability to support his spouse financially. The termination affected Simons' marriage and since being fired, he and his spouse have separated.

76. Simons continued to search for permanent work after being terminated. However, the timing of Defendants' termination made it nearly impossible for him to find a comparable teaching position for the 2018 – 2019 school year. While he received six weeks of severance pay, that sum did not even begin to cover the rest of the year that he anticipated having a steady income.

77. Simons' loss of a job after being fired from OLCA made securing a new job more difficult because of the increased stress and anxiety that Simons experiences when he is required to explain the reason that his employment ended so soon after he began working at OLCA.

78. Because his short tenure at OLCA is suspect, Simons will continue to have to explain why he left after less than two months of employment. He therefore must say (which is the truth) that he was fired for being gay and married to a man. On account of being

13

79. terminated on the basis of his sexual orientation, Simons now has a tremendous fear of coming out to, or being outed by, prospective future employers.

79. Simons has struggled to find steady employment and to support himself financially since October 2018.

80. In addition, Simons has not had health insurance since Defendants terminated him because he is unable to afford an individual health insurance plan.

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Sex-Based Discrimination in Violation of Title VII

81. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

82. By the acts and practices described above, Defendants discriminated against Plaintiff on the basis of his sex by unlawfully terminating Plaintiff's employment in violation of Title VII after learning about his sexual orientation.

83. Defendants acted with malice and/or reckless indifference to Plaintiff's rights under Title VII.

84. As a result of Defendants' discrimination, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

### SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### Sexual Orientation and Marital Status Discrimination in Violation of New York City Administrative Code § 8-107

85. Plaintiff repeats and re-alleges the preceding paragraphs as if fully set forth herein.

86. By the acts described above, Defendants discriminated against Plaintiff on the basis of gender, sexual orientation and marital status by unlawfully terminating him in violation of N.Y.C. Admin. Code § 8-107(1)(a).

87. Defendants acted with "willful or wanton negligence, or recklessness, or a 'conscious disregard of the rights of [Plaintiff] or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325 (2017).

88. As a result of Defendants' discrimination, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) Declaring that by the acts and practices complained of herein, Defendants have violated Title VII and the NYCHRL;

(b) Issuing an Order and Injunction directing OLCA and the Brooklyn Diocese to remedy its policies and practices to comply with Title VII and the NYCHRL;

(c) Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's or future employees' employment opportunities;

(d) Awarding Plaintiff compensatory damages for mental anguish, emotional distress, and humiliation as relates to Defendants' discriminatory conduct in violation of Title VII and the NYCHRL;

(e) Awarding Plaintiff punitive damages as relates to Defendants' malicious and/or willful or wanton negligence, or recklessness, or conscious disregard of Simons' legal rights under Title VII and the NYCHRL;

(f) Awarding Plaintiff pre- and post-judgment interest;

(g) Awarding Plaintiff costs and reasonable attorneys' fees; and

(h) Granting Plaintiff such other and further relief as this Court deems necessary and proper.

15

Dated: Brooklyn, New York
July 12, 2021

                                          GENDER EQUALITY LAW CENTER

                                          By: _____

                                          Allegra L. Fishel
                                          540 President Street, 3rd Floor
                                          Brooklyn, New York 11215
                                          (347) 844-9003 Ext-1
                                          afishel@genderequalitylaw.org

                                          *Attorney for Plaintiff*